## THING v. SOUTHERN PAC. CO.

Circuit Court of Appeals, Ninth Circuit.
March 4, 1929.

No. 5610.

Armstrong, Lewis & Kramer and G. W. Shute, all of Phœnix, Ariz., for appellant.

Baker & Whitney, of Phœnix, Ariz., for appellee.

Before RUDKIN and DIETRICH, Circuit Judges, and BEAN, District Judge.

DIETRICH, Circuit Judge. Appellant, as administratrix, brought this suit to recover damages for the death of Frank L. Thing, who was killed as the result of an accident in which the automobile he was driving collided with a railroad motorcar operated by defendant. She alleged that appellee negligently maintained a public crossing in an unsafe condition, and also that it failed to use due care after discovering the deceased's peril. At the close of her testimony, the court granted a motion for a directed verdict, and accordingly there was a judgment of dismissal, from which she appeals.

The accident occurred about 5 o'clock in the afternoon of July 2, 1926, at a point in Maricopa county, Ariz., where defendant's railroad track is intersected by the Phœnix-Buckeye public highway. The track runs east and west and the highway north and south. The highway was paved with concrete for a width of 16 feet, and upon either side of the pavement was a dirt apron or shoulder 4 or 5 feet wide. Two or three months earlier the railroad company had made some alterations in its track and had put in what the witnesses characterize as a temporary crossing, the conditions of which were that the pavement stopped 2 or 3 feet from the track on either side and the intervening space was filled in with gravel to a height not wholly uniform, but apparently intended to be 2 or 3 inches below the tops of the rails. But the spaces between and on either side of the rails corresponding in position to the dirt aprons or shoulders of the highway were not so filled at all, with the result that within and across these strips the tops of the rails were from 12 to 15 inches above the surface of the highway approaches. Upon an average approximately 200 cars a day passed over the crossing, and no witness had ever heard of any other accident. The deceased had driven over the crossing several times, and at least once a few days before the accident and while it was in the condition just described.

In reconstructing portions of its roadbed and track in the vicinity, the defendant employed a motorcar, referred to as a "Casey," to transport laborers to and from the places where work was being done. To the motorcar proper was attached a trailer, each being a small, low, flat car about 8 or 10 feet long; the power being supplied by a Ford automobile motor mounted on the motorcar. Just prior to the accident, this "Casey," with trailer attached, was proceeding westerly carrying about 35 laborers from work to camp, and the deceased, with whom was riding his young son, was approaching the crossing from the north. Both vehicles were on a slight downgrade toward the intersection. It was an open country with substantially no obstructions to the view, and both track and road were straight for at least a quarter of a mile. Assuming that the crossing was negligently maintained, we are of the opinion that its condition does not appear to have in any wise contributed to the accident. That the deceased first thought to cross ahead of the "Casey" by keeping on the extreme westerly side of the highway, and that, upon observing the westerly apron was not filled in across the track, he attempted, when it was too late, to save himself by changing his course, is at best only conjecture, and as we think fails to harmonize with the proven facts.

The father was killed almost instantly, and from the boy we get little information upon the controlling questions, for he had fallen asleep and was wakened by the action of the automobile after the brakes were applied, a moment before the accident occurred. In the amended complaint it is averred that the deceased approached the crossing at a speed of from 25 to 30 miles an hour. Plaintiff produced as witnesses the foreman of the railroad crew who, from his seat at the rear end of the trailer, observed the approach of the automobile, and a peace officer who shortly after the accident examined and made measurements of the automobile tracks for some distance north of the crossing. The foreman testified he first noticed the automo-

bile when the "Casey" was about 100 yards from the crossing and had reduced its speed from 15 miles an hour to "very slow." The automobile was "quite a distance up the road," estimated by him to be about 250 yards from the crossing and going at a high rate of speed. Because the highway approach from the south was to some extent obstructed by trees, he then gave attention to that side. When he next looked to the north, the "Casey" was only 25 or 30 feet from the crossing. He testified that at that moment the automobile was approaching rapidly and was about 125 feet from the crossing. He "hollered" to the driver of the "Casey" to stop, and, jumping up, waived his hand to the automobile driver also to stop. From the squeal of the brakes and the action of the car he concluded that the driver saw his signal and immediately applied the brakes. The automobile at first swerved to the right and the two right wheels passed onto the dirt apron, then there was a swerving to the left so that the car headed directly for the trailer, and at the time of the turning to the left there were sounds from the automobile indicating that the brakes had been released and the motor accelerated; and the automobile "jumped" forward. Again the automobile swerved to the right and striking the "Casey" knocked it off the track and, going over it, landed upon its side some distance beyond, badly wrecked. When struck the "Casey" had stopped at a point about 3 or 4 feet east of the westerly edge of the pavement.

In some measure the foreman is corroborated by the testimony touching the automobile tracks. It was observed by those who went out to examine them that at a point a little more than 85 feet from the railroad tracks, when all four wheels were on the pavement, the brakes were so vigorously applied as to cause the tires to drag. The tracks then swerved to the right so that the westerly one was off the pavement for some distance. The brakes were again released, or at least the wheels ceased to skid, about 55 feet from the railroad track, and at that point the peace officer testified "the wheel off the pavement showed where it spinned in the dirt, where he had stepped on the gas, like a wheel was when the car was practically at a standstill in the dirt, starting it off again." The tracks further showed that all four wheels got back on the pavement a short distance—10 or 12 feet—from the railroad track. It is not to be supposed that when he was a long distance off the deceased concluded he would cross just ahead of the "Casey" by leaving the pavement and driving out on the dirt strip; and that he had such a purpose after he came near is conclusively rebutted by the fact that, instead of speeding up, he made a vigorous application of his brakes. In no possible view of the evidence can it be said that the condition at the crossing contributed to the accident.

Nor could intelligent men reasonably find that in any respect the defendant failed in its obligation under the doctrine of the last clear chance. When the foreman first observed the automobile, 700 or 800 feet away, he had no reason to suspect that the driver would attempt to cross ahead of the railroad motor, and when he looked again and for the first time had reason to anticipate danger, he promptly ordered the motor stopped and warned the driver of the automobile.

In this state of the record, we find it unnecessary to consider to what extent, if at all, a provision in the Constitution of Arizona, requiring all issues of contributory negligence to be submitted to a jury, is binding upon federal courts.

Affirmed.